UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PAMELA EDWARDS,

              Plaintiff,

  -v-                                             5:10-CV-663

SYRACUSE UNIVERSITY,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| CRAVATH, SWAINE & MOORE LLP<br>Attorneys for Plaintiff<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019 | DANIEL SLIFKIN, ESQ.<br>YELENA KONANOVA, ESQ. |
| BOND, SCHOENECK & KING, PLLC<br>Attorneys for Defendant<br>One Lincoln Center<br>Syracuse, NY 13202 | ANDREW D. BOBREK, ESQ.<br>PETER A. JONES, ESQ.<br>BRIAN J. BUTLER, ESQ.<br>EMILY M.D. BROWN, ESQ. |

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

### I. INTRODUCTION

      On June 8, 2010, plaintiff Pamela Edwards ("plaintiff" or "Edwards") filed this action against defendant Syracuse University ("defendant" or "the University") alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and New York Human Rights Law ("NYHRL"). Plaintiff seeks back and front pay, compensatory and punitive damages, injunctive relief, and reinstatement as a tenured professor.

The parties have completed extensive discovery, and the University now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.[1] Edwards has responded in opposition, and defendant replied. Oral argument was heard on May 11, 2012, in Utica, New York. Decision was reserved.

## II. FACTUAL BACKGROUND

Unless otherwise noted, the following facts are undisputed. Edwards was hired by the University in 2002 and began a three-year tenure-track faculty position in the history department in the fall of the 2002–2003 academic year.[2] She received two positive non-tenure employment reviews in 2003 and 2004 and applied for tenure during the 2004–2005 academic year, her third at the University. Ultimately, tenure may only be granted upon the recommendation of the University's Vice Chancellor and Provost to the Board of Trustees. However, the deans and faculty within the candidate's department have a significant advisory role in the tenure application process. Further, scholars in the candidate's academic field are often solicited for an assessment of the applicant's scholarship.

In September 2004 the University initiated a tenure review process to consider Edwards's application. At the same time, the University reviewed the applications of Andrew Cohen ("Cohen") and Michael Gaddis ("Gaddis"), two of plaintiff's male colleagues in the history department. Plaintiff's application was considered separately while Cohen's and

---

[1] Defendant also moved to preclude the testimony of plaintiff's expert, Victoria Lazear. Because this expert's testimony concerns only damages and does not impact the merits of the sex discrimination claims, the motion to preclude such testimony has been adjourned pending the resolution of the motion for summary judgment. Defendant's motion to preclude expert testimony will be addressed at the time of trial.

[2] The normal tenure track at the University is six years. However, plaintiff received credit for three years of prior teaching experience. Plaintiff was given the option to waive all or part of this credit, which could have extended her tenure track period up to six years and afforded more time to develop her tenure credentials, but she chose to accept the three years of credit.

- 2 -

Gaddis's applications were considered together and, according to plaintiff, subjected to a less rigorous review. She further alleges that her rate of published scholarship exceeded that of both Cohen and Gaddis, who were granted tenure.[3]

Norman Kutcher, then-Chair of the history department ("Kutcher"), solicited reviews of Edwards's scholarship from academics outside the University. Kutcher then formed a subcommittee to review plaintiff's record in terms of scholarship, teaching, and service. This subcommittee consisted of Joseph Levine ("Levine"), David Bennett, and Stephen Webb—all tenured faculty members in the history department. The subcommittee prepared a report on plaintiff's application and distributed it to all tenured faculty members in the history department. At a meeting on September 27, 2004, the history department, by a vote of six to five, recommended against granting plaintiff tenure.

Thereafter, Edwards submitted a letter to the University's Promotion and Tenure Committee ("P&T Committee") objecting to the history department's review procedure and voting process. The P&T Committee conducted an extensive review and solicited further information from plaintiff. In December 2004 the P&T Committee held a meeting at which two faculty members—Levine and Craige Champion ("Champion")—advocated on her behalf. The P&T Committee ultimately voted fourteen to two against recommending plaintiff for tenure.

The matter was then referred to Deans Cathryn Newton ("Dean Newton") and Mitchel Wallerstein ("Dean Wallerstein"), who declined to recommend Edwards for tenure. In May 2005 Vice Chancellor Deborah Freund ("Vice Chancellor Freund") reviewed plaintiff's file and

---

[3] After conducting an investigation, the EEOC noted that between 2002 and 2009 the University's history department reviewed five applications for tenure. The department granted tenure to one female and two males (assumed to be Cohen and Gaddis), and denied tenure to one male and plaintiff.

- 3 -

formally denied her application for tenure.  In a May 9, 2005, letter to Dean Newton, Vice Chancellor Freund noted:  "[Edwards] has a rocky teaching and service record.  Her research record is good but not stellar enough to overcome her other weaknesses."  Alston Decl., Feb. 22, 2012, Ex. 4, 2.  Plaintiff was advised that her employment would end after the 2005–2006 academic year.

During the fall semester of 2005 Edwards appealed to the University Senate's Committees on Appointment and Promotions ("A&P Committee") and Academic Freedom, Tenure, and Professional Ethics ("AFTPE Committee") and alleged, inter alia, that she had been denied tenure on the basis of her sex.  The A&P Committee performed an investigation and concluded that the University did not violate any procedure while considering plaintiff's tenure application.

The AFTPE Committee formed a subcommittee to investigate the tenure review process.  This subcommittee conducted a three-month investigation and submitted a report to the full AFTPE Committee.  The AFTPE Committee, in turn, issued a report to Vice Chancellor Freund on March 2, 2006.  The report noted that "[i]t was largely (though not unanimously) acknowledged by those interviewed that the history department has had a history of gender discrimination."  Jones Decl., Feb. 22, 2012, Ex. 16, 6 ("AFTPE Report").  The investigation further revealed that although "[n]o one suggested specific instances that clearly demonstrated gender inequity in Professor Edwards's case," there were "clear indications that the evaluation of Professor Edward [sic] was affected by a general atmosphere of gender inequity."  Id.

The AFTPE Committee found that it "was likely the case" that plaintiff's tenure application was evaluated differently than those of her two male colleagues.  Id.  The report

- 4 -

concluded that "had Professor Edwards been a man she would have received tenure and promotion." Id. at 7. The AFTPE Committee recommended that Edwards receive a new tenure review by an ad hoc committee comprised of male and female senior scholars from within the University as well as outside academics in plaintiff's field of study.

Vice Chancellor Freund did not adopt the AFTPE Committee's findings, but she accepted the recommendation that Edwards be provided a new tenure review. In addition to a second review, plaintiff was granted another year of employment while the review was pending. Vice Chancellor Freund was succeeded by Eric Spina ("Vice Chancellor Spina"), who facilitated the second review process and formed an ad hoc committee of five scholars from inside and outside the University. After reviewing plaintiff's tenure file, the ad hoc committee unanimously determined that she deserved tenure.

Vice Chancellor Spina then commenced his own review of Edwards's application. Plaintiff claims this review was tainted by the same gender bias as the original tenure review because Vice Chancellor Spina relied heavily on the original reports and evaluations that contributed to the atmosphere of gender inequity found by the AFTPE Committee. She further alleges that Vice Chancellor Spina received advice from Dean Wallerstein, who plaintiff claims exhibited a bias against women.

In a March 7, 2007, letter to Edwards, Vice Chancellor Spina advised that although "the quality of the work you have published is generally agreed to be high, your rate of productivity is too low, and therefore, your scholarship, on the whole, is judged to be insufficient." Jones Decl., Feb. 22, 2012, Ex. 21. Vice Chancellor Spina thus denied plaintiff's application for tenure. Plaintiff was offered, and she accepted, an additional semester of employment. Her employment with the University ended on December 31,

2007.[4]

Edwards filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") on December 7, 2007. She alleged that the University "engaged in a continuing course of willful discrimination" against her on account of her sex. Jones Decl., Feb. 22, 2012, Ex. 24, ¶ 10. The EEOC conducted an investigation and, on March 22, 2010, advised plaintiff in writing that "it does not appear that you were denied tenure based on your gender." Jones Decl., Feb. 22, 2012, Ex. 25, 2. As a result, Edwards was issued a Right to Sue letter.

## III. DISCUSSION

The University argues that it is entitled to summary judgment because there is no issue of material fact as to whether Edwards was denied tenure due to her sex. In the alternative, the University asserts that it is entitled to partial summary judgment on the issue of damages and plaintiff's NYHRL claim, which the University maintains is time-barred.

### A. Motion for Summary Judgment—Legal Standard

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986) (citing Fed. R. Civ. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509–10 (1986). A fact is "material" for purposes of this inquiry if

---

[4] On January 1, 2008, Edwards commenced employment at the Jack Miller Center for Teaching America's Founding Principles and History ("JMC"). Any further discussion of plaintiff's employment at JMC, however, is only relevant to damages that may be awarded if she prevails at trial.

it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Id. at 250 n.4, 106 S. Ct. at 2511 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250, 106 S. Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Sex Discrimination Claims

As sex discrimination claims brought pursuant to the NYHRL are analyzed under the same legal standard as those brought pursuant to Title VII, these claims will be analyzed together. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000).

Claims of sex discrimination brought pursuant to Title VII invoke the familiar "burden-shifting framework" set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct.

1817 (1973). Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008). Under this standard, plaintiff bears the initial burden of establishing a prima facie case of sex discrimination. Id. If plaintiff makes such a showing, "the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action." Id. If the defendant satisfies this burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Leibowitz v. Cornell Univ., 584 F.3d 487, 499 (2d Cir. 2009) (internal quotation marks omitted).

Edwards need not show that the University's proffered reasons are false or played no role in her denial of tenure to avoid summary judgment. See Holcomb, 521 F.3d at 138. Instead, she must merely establish that they were not the only reasons and that her sex "was at least one of the motivating factors." Id. (internal quotation marks omitted). The Second Circuit has cautioned against granting summary judgment in a Title VII case where, as here, "the merits turn on a dispute as to the employer's intent." Id. at 137.

### 1. Prima Facie Case of Sex Discrimination

The burden of establishing a prima facie case of sex discrimination under Title VII "is not onerous." Id. at 138 (internal quotation marks omitted). In order to do so, Edwards must show: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances surrounding the adverse action give rise to an inference of discrimination. Id. The threshold for establishing that the adverse action was taken under circumstances giving rise to an inference of discrimination is "minimal." Id. at 139 (internal quotation marks omitted). It is undisputed that Edwards is a member of a protected class and that she suffered an adverse employment

action. Nor does the University argue that she was unqualified for a position as a tenured professor.[5] The dispute instead focuses on whether the circumstances surrounding her denial of tenure give rise to an inference of discrimination.

Viewing the evidence in the light most favorable to Edwards, the University initially reviewed her tenure application separately, and more rigorously, than two of her male colleagues who were both granted tenure. After a full investigation, the AFTPE Committee noted a history of gender discrimination in the history department, found that the first review of plaintiff's tenure application was "affected by an atmosphere of gender inequity," and concluded that she would have been granted tenure and promotion had she been a man. AFTPE Report, 6. Thus, plaintiff easily establishes an inference of discrimination with respect to the first review.

Defendant challenges the findings of the AFTPE Committee and argues that any discrimination in the first review is irrelevant because the second review by Vice Chancellor Spina was independent and not tainted by discrimination. However, there is sufficient evidence in the record to present an issue of material fact as to whether Vice Chancellor Spina's review was negatively affected by the same atmosphere of gender discrimination that impacted the first review, even if he did not harbor any discriminatory animus himself.

This situation invokes the "cat's paw" theory of discrimination, which seeks to hold an

---

[5] As addressed below, the University maintains that the rate of Edwards's scholarship production was insufficient to justify tenure and constituted a legitimate, nondiscriminatory reason for denying tenure. Defendant does not, however, argue that plaintiff was not qualified for her position for purposes of making out a prima facie case. Indeed, such is established through the positive non-tenure reviews, the ad hoc committee's unanimous determination that she was deserving of promotion and tenure, and the various faculty members who expressed same. This is sufficient to satisfy the minimal burden necessary for a prima facie case. See Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 171 (2d Cir. 2006) ("A plaintiff only needs to demonstrate that she possesses the basic skills necessary for performance of the job." (internal quotation marks and alterations omitted)).

employer liable for the discriminatory animus of a supervisor who did not actually make the ultimate employment decision.  This case is similar to Staub v. Proctor Hospital in which the United States Supreme Court held that "if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable.  But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified."  131 S. Ct. 1186, 1193 (2011).[6]

Edwards alleges that Dean Wallerstein, who recommended against tenure during the first review, had a history of bias against women that tainted both tenure reviews.  Assuming, for purposes of this motion for summary judgment, that Dean Wallerstein did display a bias against female faculty members,[7] there is sufficient evidence in the record for a reasonable jury to find that he influenced the second tenure review.

Vice Chancellor Spina acknowledged speaking with Dean Wallerstein about plaintiff's tenure application before the ad hoc committee was selected.  See Spina Dep. Tr., 83–84.  He further noted that he sought Dean Wallerstein's input regarding who to appoint to the ad hoc committee and saw "no reason" to exclude him from involvement in the second tenure

---

[6] Although Staub involved a claim under the Uniformed Services Employment and Reemployment Rights Act, the Court noted that this statute "is very similar to Title VII" in that it merely requires a showing that discrimination was "a motivating factor for any employment practice." Id. at 1191. Although the Second Circuit has not explicitly found the cat's paw theory to be applicable to Title VII claims, it has noted a plaintiff may succeed on such a claim if the allegedly biased individual "played a meaningful role" in the termination process, even absent evidence of bias by the ultimate decision-maker. See Holcomb, 521 F.3d at 143 (internal quotation marks omitted).

[7] Indeed, Don Mitchell, a professor at the University and Chair of the AFTPE Committee, testified that Dean Wallerstein "was more dismissive . . . of some of our women members" and worked "vigorously against" efforts to enhance feminist scholarship in the geography department. Konanova Decl., Mar. 22, 2012, Ex. 2, 107:2, 111:8–10.

review.  Id. at 128–29, 133:17.  Dean Wallerstein also "weighed in" regarding what materials should be provided to the ad hoc committee.  Id. at 139:21–25, 140:11–13.  Specifically, Dean Wallerstein encouraged Vice Chancellor Spina to include a negative review of plaintiff's book and later asked a member of the ad hoc committee whether that book review had been provided.  Id. at 146:1–5, 154–55.  Vice Chancellor Spina also solicited input from Dean Wallerstein after the ad hoc committee issued its report, but before Vice Chancellor Spina made his final decision regarding plaintiff's tenure.  Id. at 189:5–8, 221–22.

Moreover, at oral argument, defendant acknowledged that Vice Chancellor Spina reviewed plaintiff's entire tenure application file, including evaluations and information from the first review that the AFTPE Committee found to be colored by gender bias.  Vice Chancellor Spina confirmed this during his deposition.  Id. at 225.  In short, there remains an issue of material fact as to whether the second review of Edwards's tenure application was tainted by the same alleged discrimination that tainted the initial review and denial of tenure, thereby giving rise to an inference of discrimination.

### 2. **Defendant's Nondiscriminatory Reason for Adverse Action**

The University argues that even if Edwards can establish a prima facie case of sex discrimination, it had a legitimate nondiscriminatory reason for denying her tenure; to wit, the rate of her scholarship production was too low and did not promise future excellence.[8]  When considering an application for tenure, the University evaluates a candidate in terms of his or

---

[8] Defendant also cites Zahorik v. Cornell University, 729 F.2d 85, 93 (2d Cir. 1984), for the proposition that courts should afford deference to the academic judgments of institutions of higher education—especially tenure decisions.  However, the Second Circuit further noted that "[t]enure decisions are not exempt under Title VII," especially where—as here—the tenure review was marked by procedural irregularities, evidence of bias by involved persons exists, and there is "a showing that some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question [of plaintiff's tenure]."  Id. at 93–94.

her scholarship, teaching, and service.  Defendant acknowledges that Vice Chancellor Spina found plaintiff's teaching and service to be "adequate" and not determinative in his consideration of her application.  Def.'s Statement of Material Facts, ¶ 87; Jones Decl., Feb. 22, 2012, Ex. 20, 1 ("Spina Considerations").  The ultimate decision to deny plaintiff tenure was instead based on her scholarship.

It is undisputed that Edwards wrote and published three scholarly articles prior to her employment at the University.  She published her first book, The Statesman's Science, while employed at the University in 2004.  This book received positive reviews and was nominated for an award by Columbia University Press.  The parties dispute, however, how much of this book was actually researched and written while plaintiff was employed at the University.  Defendant asserts that the book was written prior to plaintiff's employment and is almost identical to her doctoral dissertation.  Plaintiff claims that she substantially re-oriented and expanded her dissertation into the book while employed at the University.

Also during her employment at the University, plaintiff authored an entry in The Oxford Dictionary of National Biography that was released in late-September 2004.  When her tenure application was being reviewed, plaintiff had one article in the final stages of publication, two articles prepared for submission for publication, and was under contract to co-author a chapter in The Cambridge Companion to Nineteenth Century Philosophy to be published in 2005.  In her application, plaintiff identified twenty-five scholarly papers and addresses that she wrote and/or delivered—ten of which occurred after she began working at the University in the fall of 2002.  She was also in the process of writing a second book and had begun a major research project.

The P&T Committee and Vice Chancellor Spina found plaintiff's scholarship to be of

"high" quality. Jones Decl., Feb. 22, 2012, Ex. 9, 5; Spina Considerations, 3. However, Vice Chancellor Spina determined that the rate of her productivity was too low to justify tenure. This view conflicts with other faculty members and scholars who evaluated plaintiff's application materials. Levine opined to the P&T Committee: "It is astounding that she has been able to finish a book and begin 2 others plus write and [sic] article within 2.5 years. She has done more publication already than several of the faculty members who voted on her tenure!" Jones Decl., Feb. 22, 2012, Ex. 10, 1. Champion reported that "[s]he is the most active person in the department with regard to conference presentations." Id. at 4.

The ad hoc committee unanimously recommended Edwards for tenure after concluding that "her scholarship is considered first rate and deserving of tenure as evaluated by scholars in the field outside of Syracuse University." See Jones Decl., Feb. 22, 2012, Ex. 19, 1. In its report, the ad hoc committee noted that nine outside scholars evaluated her work, "and all concur that its quality merits promotion and tenure." Id. at 5. In terms of quantity, these scholars determined that, "along with the book, Edwards' extensive conference participation has already served to establish her prominence in the field." Id.

Although Vice Chancellor Spina was not bound by the recommendations of the ad hoc committee and other faculty members at the University, these conflicting assessments of Edwards's scholarship present at least a genuine issue of material fact as to whether the University's proffered reason for denying her tenure is legitimate and nondiscriminatory or, as discussed below, merely a pretext for discrimination.

### 3. Pretext for Discrimination

Assuming the University has met its burden to put forth a legitimate, nondiscriminatory reason for the adverse employment action, there is competent evidence suggesting this

proffered reason was merely a pretext for discrimination. It is undisputed that the University granted tenure to two of Edwards's male colleagues in the history department whose rate of scholarship was arguably equal to or less than hers. There is also some evidence to support plaintiff's assertion that these male professors' tenure applications were held to a different standard.

The P&T Committee's report regarding Cohen's tenure application indicates he had published one book (an extensive revision of his dissertation) and three scholarly articles in his first five years at the University. See Edwards Decl., Mar. 22, 2012, Ex. 16, 5. The P&T Committee's report on Gaddis's tenure application noted that at the time of his review he had one book (a revised and expanded version of his doctoral thesis) in publication and had "undertaken to co-author a translation of a vital historical document." Edwards Decl., Mar. 22, 2012, Ex. 17, 3. The report indicated that Gaddis—who, like Cohen, had been employed at the University since the fall of 1999—had a significant teaching and service workload, which "demands that we focus upon the quality of his scholarly work, not its quantity." Id. at 1.

As noted above, in only three years at the University, Edwards had published a book and an entry in The Oxford Dictionary of National Biography. She also produced at least ten scholarly papers for presentations, had one article in the final stages of publication, two articles prepared for submission for publication, and was under contract to co-author a chapter in a forthcoming book. Further, unlike Gaddis's review, the quantity of her work remained in focus despite almost universal praise for its quality.

In addition, plaintiff's teaching responsibilities were ultimately turned over to a male professor, Chris Kyle ("Kyle"), who was granted tenure shortly after her employment ended.

- 14 -

Plaintiff alleges that Dean Wallerstein opposed her tenure application and interfered with her second tenure review in an effort to secure a tenured professor position for Kyle. There is evidence in the record to support this assertion. Indeed, on March 25, 2006—after the AFTPE Committee's report was issued and before the ad hoc committee was assembled—Dean Wallerstein sent an email to Dean Newton in which he wrote: "I'm afraid that, until the Pamela Edwards matter is finally settled, there is little prospect of finding a regular line for [Kyle] in the Department." Konanova Decl., Mar. 22, 2012, Ex. 15. Further, although Dean Wallerstein maintained that an anonymous source gave him the negative review of plaintiff's book, which he attempted to have put before the ad hoc committee, documents in the record indicate Kyle was the "anonymous" source. See Konanova Decl., Mar. 22, 2012, Exs. 11, 12, 14.

Thus, viewing the record in the light most favorable to Edwards for purposes of this motion, there is sufficient evidence for a rational trier of fact to conclude that the University's proffered reason for denying her application for tenure was merely a pretext for discrimination and that her sex was a motivating factor for defendant's decision.

In sum, there are genuine issues of material fact as to whether the circumstances surrounding plaintiff's denial of tenure give rise to an inference of discrimination and whether the University's proffered reason for this employment action was merely a pretext for discrimination. Accordingly, defendant's motion for summary judgment will be denied as to the sex discrimination claims.

## C. Timeliness of the New York Human Rights Law Claim

While a NYHRL claim is analyzed under the same legal standard as a Title VII claim, the statute of limitations for these claims are different. Under the NYHRL, an employee

aggrieved by an allegedly unlawful discriminatory practice has either one year to initiate an administrative proceeding with the Division of Human Rights or three years to file an action in court.  N.Y. EXEC. LAW § 297(5); N.Y. C.P.L.R. § 214(2).

Edwards received Vice Chancellor Spina's decision denying tenure on March 7, 2007.  She filed a timely EEOC complaint on December 7, 2007.  After completing a full investigation, the EEOC issued a Right to Sue letter on March 22, 2010.  Plaintiff filed this action on June 8, 2010—over three years after she was officially denied tenure.  Thus, her NYHRL claim is untimely unless the statute of limitations was tolled during the pendency of the EEOC investigation.

The parties cite opposing case law to support their respective arguments concerning whether the filing of an EEOC charge, and its subsequent investigation, tolls the statute of limitations prescribed by the NYHRL.  The cases holding that the statute of limitations is tolled are more persuasive.  See DeJohn v. Wal-Mart Stores East, LP, No. 5:09-CV-1315, 2012 WL 3679204, at *12 (N.D.N.Y. Aug. 17, 2012) (McCurn, S.J.); Sloth v. Constellation Brands, Inc., __ F. Supp. 2d __, 2012 WL 2090079, at *10 (W.D.N.Y. 2012); DeNigris v. N.Y.C. Health & Hosps. Corp., 861 F. Supp. 2d 185, 192 (S.D.N.Y. 2012); Burns v. Cnty. of Schenectady, No. 07-CV-776, 2009 WL 2568546, at *4 (N.D.N.Y. Aug. 18, 2009) (Sharpe, J.); Sundaram v. Brookhaven Nat'l Labs., 424 F. Supp. 2d 545, 565 (E.D.N.Y. 2006).

Moreover, before filing a Title VII discrimination claim in federal court, an aggrieved employee must first file a complaint with the EEOC.  42 U.S.C. § 2000e-5 (2006); Williams v. N.Y.C. Hous. Auth., 458 F.3d 67, 69 (2d Cir. 2006).  This provides "an opportunity for the resolution of discrimination complaints by means of conciliation, conference, and persuasion."  Wrenn v. Sec'y, Dep't of Veteran Affairs, 918 F.2d 1073, 1078 (2d Cir. 1990)

(internal quotation marks omitted).  Unless the NYHRL statute of limitations is tolled, Edwards would be forced to file a separate action in state court to preserve her NYHRL claim while the EEOC investigates, and possibly resolves, the allegedly discriminatory matter. Such a result would frustrate the interests of judicial economy and the purpose of the exhaustion requirement of Title VII.

Accordingly, the statute of limitations prescribed under NYHRL was tolled from December 7, 2007, when Edwards filed her EEOC complaint, to March 22, 2010, when she received a Right to Sue letter.  Her NYHRL claim is therefore timely and, like the Title VII claim, survives defendant's motion for summary judgment.

### D. **Damages**

Finally, the University argues that it is entitled to summary judgment on the issue of economic and punitive damages.  Specifically, defendant asserts Edwards is not entitled to front or back pay because she began a higher paying job immediately upon leaving the University.  Defendant also asserts that plaintiff is not entitled to punitive damages because, as a matter of law, there is no evidence that the University acted maliciously or with reckless indifference to her rights.

These issues are better resolved at trial.  Indeed, both parties claim to have economic experts who will offer testimony concerning Edwards's income potential and how it affects front and back pay.  Moreover, whether the defendant's conduct was sufficiently malicious and reckless to justify punitive damages is an issue to be decided by a jury after hearing the evidence at trial.  It is noted, however, that punitive damages are not available for violations of the NYHRL.  Thoreson v. Penthouse Int'l, Ltd., 80 N.Y.2d 490, 499 (1992).

Accordingly, defendant's motion for summary judgment with respect to available damages will be denied.

## IV. CONCLUSION

Viewing the evidence in the light most favorable to Edwards, there are genuine issues of material fact as to whether the circumstances surrounding her denial of tenure give rise to an inference of discrimination and whether the University's proffered reason for her denial was merely a pretext for discrimination. Moreover, plaintiff's NYHRL claim is timely as the statute of limitations was tolled during the pendency of the EEOC investigation. Finally, whether plaintiff is entitled to front and/or back pay or punitive damages is an issue to be resolved at trial.

Therefore, it is

ORDERED that

The defendant Syracuse University's motion for summary judgment is DENIED.

IT IS SO ORDERED.

_____
United States District Judge

Dated: December 4, 2012
      Utica, New York.